*To Be Argued by Michael H. Sussman*

# 24-1039

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
--------------------------------------------------------

ELKA GOTFRYD,

*Plaintiff-Appellant,*

v.

CITY OF NEWBURGH, ALEXANDRA CHURCH, and JOSEPH DONAT,

*Defendants-Appellees.*

--------------------------------------------------------
**On Appeal from an Order and Judgment of the**
**United States District Court for the Southern District of New York**

---

## APPELLANT'S BRIEF-IN-CHIEF

---

SUSSMAN & GOLDMAN
*Attorneys for Plaintiff-Appellant*
1 Railroad Avenue, Suite 3
P.O. Box 1005
Goshen, New York 10924
(845) 294-3991 [Tel.]
(845) 294-1623 [Fax]
sussman1@sussman.law

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................... ii

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.....2

STATEMENT OF ISSUES PRESENTED....................................................2

STATEMENT OF THE CASE...................................................................3

STATEMENT OF FACTS ........................................................................3

SUMMARY OF ARGUMENT ..................................................................9

STANDARD OF REVIEW ......................................................................10

ARGUMENT .......................................................................................12

      Point I

      Appellant's speech was constitutionally protected .......................................12

      Point II

      A reasonable jury could find that Appellees violated Appellant's
      right to Equal Protection.................................................................28

      Point III

      Appellant's *Monell* claim is viable..............................................31

      Point IV

      Qualified immunity does not shield the individual Appellees ......................32

CONCLUSION......................................................................................34

CERTIFICATE OF COMPLIANCE..........................................................35

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Agosto v. NY City Dept of Education*,
    982 F.3d 86 (2d Cir. 2020) ............................................................31

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).............................................................................10

*Connick v. Myers*,
    461 U.S. 138 (1983).............................................................................24

*Danzer v. Norden Systems, Inc.*,
    151 F.3d 50 (2d Cir. 1998) ...............................................................11

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)...............................................................12, 20, 24

*Givhan v. Western Line Consol. School Dist.*,
    439 U.S. 410 (1979)...............................................13, 22, 23, 32

*Gordon v. NY City Board of Educ.*,
    232 F.3d 111 (2d Cir. 2000) ...............................................................24

*Holcomb v. Iona College*,
    521 F.3d 130 (2d Cir. 2008) .......................................................10, 11

*Lane v. Franks*,
    573 U.S. 228 (2014)......................................................................13, 14

*Looney v. Black*,
    702 F.3D 701 (2d Cir. 2012) .............................................................19

*Matthews v. City of New York*,
    779 F.3d 167 (2d Cir. 2015) .............................................14, 15, 16

*Meiri v. Dacon*,
    759 F.2d 989 (2d Cir. 1985) .............................................................11

*Montero v. City of Yonkers*,
 890 F.3d 386 (2d Cir. 2018) ...........................................................24

*Morris v. Landau*,
 196 F.3d 102 (2d Cir. 1999) ...........................................................11

*Naumovski v. Norris*,
 934 F.3d 200 (2d Cir. 2019) ...........................................................30

*Pickering v. Bd. of Educ.*,
 391 U.S. 563 (1968)...........................................................13

*Piesco v. City of New York*,
 933 F.3d 1149 (2d Cir. 1991) ...........................................................11

*Reeves v. Sanderson Plumbing Products, Inc.*,
 530 U.S. 133 (2000)...........................................................11

*Schiano v. Quality Payroll Sys.*,
 445 F.3d 597 (2d Cir. 2006) ...........................................................11

*Thomas v. Sagaties*,
 2011 U.S. Dist. LEXIS 135392 (S.D.N.Y. 2011) ...................................16, 17

*Vega v. Hempstead U.F.S.D.*,
 801 F.3d 72(2d Cir. 2015) ...........................................................28, 29, 30, 33

*Weintraub v. Bd. of Educ.*,
 593 F.3d 196 (2d Cir. 2010) ...................................14, 21, 22, 23

## **Statutes**

28 U.S.C. § 1291 ...........................................................2

28 U.S.C. § 1331 ...........................................................2

42 U.S.C. § 1983 ...........................................................2

42 U.S.C. § 1988...........................................................2

City of Newburgh Charter, § C5.05(B) ....................................................32

## **Federal Rules**

Fed. R. App. P. 4 ...........................................................................................2

Fed. R. Civ. P. 56(a)......................................................................................10

## PRELIMINARY STATEMENT

Appellant worked for more than one year as the City of Newburgh's City Planner. On March 7, 2021, without providing her with any reason for his adverse action, Appellee former City Manager Joseph Donat terminated her. Appellant's immediate supervisor, Planning Director Alexandra Church, did not recommend Appellant's termination; indeed, Donat never asked her whether Appellant should be terminated. By March 2021, Church believed Appellant's performance had improved "dramatically".

At deposition, when asked why he terminated Appellant, Donat claimed that she was insubordinate, worked outside the scope of her duties and authority, and did not follow directions.

Taken at face value, Donat terminated Appellant because she engaged in conduct which, though he could not specify or recall any details and did not submit the same below, were outside the scope of her employment.

From the sequence of events presented below, it is clear that Donat feared that Appellant would continue to point out the need for Newburgh to adopt anti-racist policies to reverse the effects of federal, state, county and local policies, which had left the City with a deteriorating housing stock subject to gentrification and had caused the displacement of racial minorities.

1

A reasonable jury could resolve that, contrary to the district court's conclusion, Donat concluded that Appellant's speech acts were outside the scope of her employment, that she was acting as a citizen, not an employee, when she challenged what she regarded as racist city policies, and that she was terminated for this reason, in violation of rights protected by the First and Fourteenth Amendments as further explained below.

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

As Appellants' claims arise under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the U.S. Constitution, the district court below had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1988. On April 10, 2024, the district court entered its Opinion and Order granting summary judgment and dismissing the action and entered final judgment to that effect. On April 19, 2024, Appellant timely filed her notice of appeal, and so this Court has appellate jurisdiction under 28 U.S.C. § 1291. *See also* Fed. R. App. P. 4.

## STATEMENT OF ISSUES PRESENTED

1. Whether Appellant engaged in speech protected by the First Amendment?

2. Whether a reasonable jury could conclude that Appellees terminated Appellant for her protected speech acts?

3. Whether Appellant established an Equal Protection claim under the Fourteenth Amendment, where a reasonable jury could conclude that

2

Appellees terminated her for opposing racially discriminatory municipal policies?

## STATEMENT OF THE CASE

Appellant timely filed her Complaint alleging violations of the First and Fourteenth Amendments on May 6, 2021 (JA-10-20). Appellees answered on June 3, 2021, conceding the district court's jurisdiction over the federal questions raised by the Complaint (JA-21-28). Following discovery, Appellees filed their motion for summary judgment on March 6, 2023 (JA-29-673). The district court granted that motion on April 10, 2024 (SA-1-15), and the Clerk's office entered judgment the same day (SA-16). On April 19, 2024, appellant timely noticed her appeal from the final order (JA-714-30).

## STATEMENT OF FACTS

Donat interviewed Appellant, found her qualified for the position of City Planner, and appointed her to this job. During the first several weeks of her employment, Appellant worked under Church, the Planning Commissioner.

Early in her employment, Appellant reviewed the scope of a housing assessment an outside consultant, Kevin Dwarka, had been contracted to perform (JA-680-681). She was tasked with reviewing and revising the scope of work to ensure that it met municipal needs (JA-73-74). Appellant suggested a focus on developing policies which would be "anti-racist" (JA-682 ¶ 40; JA-683 ¶ 43), and

3

countervail housing policies and practices that had segregated substantial parts of the City and consigned the poor to degenerating housing stock. Church objected to Appellant's use of the term "anti-racist" and told Appellant that term would alienate Hispanic homeowners.

Before terminating Appellant, Donat knew of the controversy between her and Church regarding the use of the term "anti-racist" in the setting of goals for the city's housing assessment (JA-397; JA-399-400). He claimed that the City Council was producing its own housing objectives while Godfryd was promoting anti-racism (JA-397-99), suggesting that, in pressing for anti-racist policies, Appellant acted outside her duties as a city employee.

Three weeks after Appellant commenced her employment, Church went out on maternity leave for three months (JA-708 ¶ 4). During this period, Appellant was without supervision, and City Manager Donat learned next to nothing about what she was doing (JA-708 ¶ 2).

Church returned in June 2020. By then, Appellant had created an agenda for a Newburgh Housing Coalition meeting to be held on June 8. As part of that agenda, Appellant again focused on promoting anti-racist housing and displacement policies (JA-686 ¶ 58). Church received the memo and directed Appellant not to circulate any document outside the Planning office without her prior approval (JA-686 ¶ 60).

During a conversation with Appellant on July 10, 2020, Church expressed consternation that Appellant's use of the word "anti-racist" would alienate powerful county interests which supported Newburgh's Planning Department (JA-709 ¶ 6). Church became upset with Appellant when she continued to explain the need for more aggressive municipal policies to fight decades of racist housing policies.

In late July and early August 2020, Appellant attended several meetings of Code Sweep, a program intended to support enhanced municipal code enforcement efforts. Erin Cousins ran this program for Newburgh and Appellant had no specific role in its implementation (JA-117-18). As structured, this program directed resources to several blocks in the African American community. Appellant was concerned that the program would accelerate displacement and believed the city should be enforcing its code uniformly across the city (JA-123). She also noted that the areas selected for this enhanced enforcement were allegedly areas with high crime rates (JA-710 ¶ 11). Appellant objected to the association between poverty and crime on these blocks and sought evidence of any such association (JA-477-80).

After a second Code Sweep meeting, Appellant objected to one of her peer's characterization of residents of these blocks as "junkies" and "criminals" and challenged Church and other staff to examine their own racial biases (JA-479-80). Again, Church did not focus on the racist associations others on her staff made, but, instead, focused on making staff feel more uncomfortable (JA-478). Indeed, Church

advised Cousins to file a grievance against Appellant for allegedly making false claims about what she had said at a Code Sweeps meeting (JA-137).

On August 25, 2020, Church and Appellant met and Church began reviewing alleged performance deficiencies. Appellant believed Church's statements were inaccurate and offered contrary evidence (JA-145-46). After a time, the focus of the meeting shifted, and Appellant stated that she wanted to be more involved in conversation about "what we are doing to represent minority communities in planning." Church replied that planning was doing all it could, and Appellant disagreed (JA-146-47, 157). Church then asked Appellant whether she was calling her a racist (JA-147). Godfryd responded "yes, I believe we all have implicit bias that we need to work on" (*Id.*). Church then accused Appellant of being combative and left the room crying (*Id.*).

After Church left the room, Appellant explained to Stanley Merritt, the City's HR director, and the two union representatives there with her, how Church had been treating her (JA-147-48). After twenty minutes, Church returned, and the meeting ended (*Id.*).

On September 3, 2020, Church provided Appellant a written counseling memo to which Appellant responded on September 21, providing a sixty-page document refuting claims of inadequate job performance. That response was in the

form of a grievance, which Appellant filed with Donat accusing Church of retaliating against her by and through the September 3 counseling memo (JA-710 ¶ 12).

In that counseling memo, Church set forth seven directives to Appellant and scheduled a follow-up meeting for October 8, 2020. Appellant never again heard from Church regarding the seven directives. No one claimed she had violated any of them. And Church did not keep the October 8, 2020, appointment and never provided any other counseling memorandum to Appellant (JA-710-11 ¶¶ 12-13).

In the fall 2020, Appellant began collaborating with African American community leaders to obtain a grant to study and document the history of African Americans in the city. Church knew of the project (JA-711 ¶ 14).

In December 2020, in preparing the draft grant proposal, Appellant noted that an important City land use board, the Architectural Review Commission, had no members of color (JA-169-79). Upon seeing this document, Church called Appellant to her office and told her that Appellant "can't refer to the fact that they're all white" (JA-179-80). She told Appellant that inclusion of this fact would open the City up to a lawsuit (*Id.*). Church was particularly upset that Appellant had circulated a draft with this fact to others and demanded that Appellant not circulate any document to anyone outside the Planning Department before showing it to her. Appellant noted that Church had told her to contact stakeholders and she was doing that. Church continued to insist that Appellant run things by her (JA-181-83).

During Appellant's employment, Donat learned that Appellant used the term "anti-racist" in creating an agenda for a Housing Coalition meeting and that Church objected to this (JA-404-05), that Appellant expressed concern about racial bias in the Code Sweep Program as administered by the City of Newburgh (JA-410), and that Appellant complained that Church's September 3, 2020 counseling memo was retaliation for her raising concerns about racism in city housing and anti-displacement programs (JA-421-22).

After learning that Appellant believed the City's programs did not sufficiently focus on reversing racist housing and anti-displacement efforts and that Church was retaliating against her for this advocacy, Donat initiated no discussion with Appellant (JA-422).

Before terminating her, Donat also knew that Appellant had included reference to the under-representation of racial minorities on the Architectural Review Commission ["ARC"] in the draft grant application seeking funds to study the history of African Americans in Newburgh (JA-424-25). When he learned what Appellant had written about the ARC, Donat knew her statement about under-representation was true (JA-425). He also knew that, as City Manager, he appointed those serving on the ARC (JA-426). When he terminated Appellant, Donat knew that Church had "exchanged words" with Appellant over her inclusion of this fact in the draft grant proposal (JA-428).

According to Church, after she provided Appellant with the September 3, 2020 counseling memorandum, she claims that Appellant "improved dramatically in personality and in working with other people" (JA-707 ¶ 18). After the summer 2020, Church did not recommend Appellant's termination to anyone (JA-707 ¶ 19). Indeed, Church testified that, after the summer 2020, she never discussed Appellant's job performance with City Manager Donat (JA-707 ¶ 20).

On March 7, 2021, Donat terminated Appellant. He provided no reason for this action (JA-702-04 ¶ 124 & response thereto). At deposition, Donat claimed, with no detail or specifics, that Appellant was insubordinate, acted outside the scope of her employment and did not follow unspecified directions. He disclaimed reliance on time and attendance issues or the Coverdale reports as bases for his adverse action

## SUMMARY OF ARGUMENT

In granting summary judgment to Appellees, the district court erroneously held that none of the speech Appellant engaged in was constitutionally protected because she engaged in all of it as part of her duties as the City Planner (SA-10). As this conclusion contravenes the testimony of the decision-maker, this Court should reverse. In fact, Appellant's speech was outside the scope of her employment and protected.

Likewise, the district court erred in concluding that Appellant's Fourteenth Amendment claim was co-extensive with and resolved by its decision on her First Amendment claim. This court has recognized that an employee terminated for opposing racial discrimination at the workplace may state a Fourteenth Amendment claim regardless of his/her/their own race.

## STANDARD OF REVIEW

Summary judgment is appropriate only where the moving party establishes there is no genuine dispute as to any material fact, entitling it to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if its resolution could affect the outcome of the suit and a dispute is genuine if reasonable minds may differ on its resolution. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If a reasonable jury could return a verdict for the non-moving party, then summary judgment is inappropriate and the court must deny the motion. *See Id.* at 250.

The court must view the record in the light most favorable to the non-moving party, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in [its] favor." *See Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). Its function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . ." *Id.* at 255. And

"summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *See Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 54 (2d Cir. 1998).

Critically, the court should review the record as a whole and, in doing so, "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000). As such, "the court should give credence to the evidence favoring the non-movant as well as the evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id*.

Finally, this court has long cautioned against granting summary judgment in cases that turn on the issue of intent. *See Holcomb*, 521 F.3d at 137; *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (internal quotations omitted). At bottom, "summary judgment is inappropriate when 'questions of motive predominate' in the inquiry about the role the protected behavior played in the employment decision." *Morris v. Landau*, 196 F.3d 102, 111 (2d Cir. 1999) (citing *Piesco v. City of New York*, 933 F.3d 1149, 1154-60 (2d Cir. 1991)).

## ARGUMENT

## Point I

**Appellant's speech was constitutionally protected.**

Below, Appellees acknowledged that Appellant spoke about matters of public importance and do not claim an absence of causal relationship between her advocacy and her termination. Rather they submitted, and the district court held, that Appellant did not engage in constitutionally protected speech because her speech acts all were conducted within the scope of her duties.

But his conclusion conflicts with the reasons City Manager Donat provided for terminating Appellant – that she was functioning *outside* the scope of her employment and was being insubordinate, presumably because she was so functioning. And the City's position also conflicts with persuasive authority which is directly on point.

To succeed on a First Amendment retaliation claim, a public employee must first establish that he spoke as a citizen on a matter of public concern. In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court held that when a public employee speaks in his capacity as an employee, rather than as a private citizen, his speech is not protected by the First Amendment.

But what does it mean to speak as an employee? *Garcetti* set forth certain principles to guide this inquiry. First, the fact that an employee speaks within her

organization, rather than publicly, is not dispositive. *See Id.* at 420 (citing *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 414 (1979)). As the Court recognized, "Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like any member of the general public . . . to hold that all speech within the office is automatically exposed to restriction. *Id.* at 420-21 (quotation & citations omitted). The fact that the subject matter of the employee's speech relates to his job also does not automatically render it unprotected employee speech. *See Id.* at 421. (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 572 (1968)).

Rather, the Court adopted a functional approach that looks to the nature of the employee's job duties. In doing so, it recognized that "[r]estricting speech *that owes its existence to a public employee's professional responsibilities* does not infringe any liberties the employee might enjoy as a private citizen" but rather, "[it] simply reflects the exercise of *employer control over what the employer itself has commissioned or created*." *Id.* (emphasis added). Thus, a public employee speaks in that capacity, rather than as a private citizen, when he makes "statements pursuant to [his] official duties."

In *Lane v. Franks*, 573 U.S. 228 (2014), the Supreme Court clarified that speech is not made pursuant to one's official duties simply because it relates to his employment or because his speech concerns information he learned exclusively by

dint of his public employment. In doing so, it reaffirmed that the "critical question under *Garcetti* is whether the speech at issue is itself *ordinarily within the scope of an employee's duties*, not whether it merely concerns those duties." *Id.* at 240 (emphasis added).

In *Weintraub v. Bd. of Educ.*, 593 F.3d 196 (2d Cir. 2010), this Court held that a public school teacher's internal union grievance complaining about his superior's failure to discipline a student in his class spoke not as a citizen but pursuant to his job duties because the grievance was "part-and-parcel of his concerns about his ability to properly execute his duties," which included the duty to "maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning." *Id.* at 203 (quotations & citations omitted). Also relevant to the Court's analysis was the lack of a civilian analogue to the type of internal union grievance the plaintiff contended constituted protected speech. *See Id.*

By contrast, in *Matthews v. City of New York*, 779 F.3d 167 (2d Cir. 2015), this Court held that a police officer spoke to his commanders as a private citizen when criticizing his department's arrest-quota policy. *Id.* at 169. In doing so, the Court recognized that criticizing such a precinct-wide policy "was neither part of his job description nor part of the practical reality of his everyday work." *Id.* at 174. Looking to the Patrol Guide, which set forth the officers' duties and responsibilities, the Court noted that the guide does not include "a duty to provide feedback on

precinct policy or any other policy-related duty." *Id.* It also noted that the plaintiff testified that his ordinary duties "did not include reporting misconduct of supervisors [or] . . . commenting on precinct-wide policy." *Id.* Further, the plaintiff "had no role in setting policy; he was neither expected to speak on policy nor consulted on formulating policy." *Id.* His superiors further testified that "a police officer has no duty to monitor the conduct of his supervisors" and that the plaintiff "neither met regularly with the Captains nor submitted regular reports to them." *Id.* Thus, the Court concluded that the plaintiff's "actual, functional job responsibilities did not include reporting his opinions on precinct-wide quota systems to Precinct commanders." *Id.*

Matthews' speech also had a comparable civilian analogue. *See Id.* at 175-76. This Court explained: "Unlike the teacher in *Weintraub*, Matthews did not follow internal grievance procedures, but rather went directly to the Precinct commanders, with whom he did not have regular interactions and who had an open door to community comments and complaints." *Id.* at 176. And it noted that "Matthews chose a path that was available to ordinary citizens who are regularly provided the opportunity to raise issues with the Precinct commanders." *Id.* Of note, this Court rejected the district court's reasoning that Matthews' speech lacked a civilian analogue because, as an officer, he had more ready access to his superiors than would an ordinary citizen, concluding: "We do not consider the relative degree of access to

15

be material; rather what matters is whether the same or a similar channel exists for the ordinary citizen." *Id.*

In sum, *Matthews* held that "when a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee." *Id.* at 174. *Matthews* is directly on point and dispositive here.

Similarly, in *Thomas v. Sagaties*, No. 09-cv-5116, 2011 U.S. Dist. LEXIS 135392 (S.D.N.Y. 2011), the plaintiff worked as a social worker at a state correctional facility, where she was supposed to provide mental health treatment to inmate-patients with serious mental illness. She was allegedly terminated for insubordination and failure to abide by established policies. *Id.* at *3. Instead, plaintiff alleged that defendants terminated her because she had complained to her supervisors about the inappropriate treatment of inmates, specifically inmates of color.

Like here, while defendants claimed that they held meetings to correct plaintiff Thomas' behavioral issues, she asserted that the meetings were intended to curb her advocacy for allegedly abused inmate-patients. As here, plaintiff Thomas further alleged that defendants misrepresented events that occurred during her

employment to railroad her because of her advocacy and that she was discharged in retaliation for her complaints about the disparate, racially motivated treatment of inmate-patients at Sullivan in violation of the First and Fourteenth Amendments to the Constitution. *Id.* at *7-9.

In *Thomas*, like here, defendants claimed "that the plaintiff's complaints of disparate, racially motivated treatment of inmate-patients were made pursuant to her official job duties and are therefore unprotected." *Id.* at *13. The district court noted that this assertion "is in direct conflict with the evidence offered by the defendants themselves," since, when they had chastised plaintiff for her advocacy on behalf of these inmates, they strongly suggested that she was acting outside the scope of her duties. *Id.*

Likewise, in the instant case, each time Appellant raised concern that City housing or anti-displacement policies did not strongly enough oppose racism in Newburgh, her supervisor claimed that such concern was *outside* the scope of her employment and sought to curb such expression. With regard to her February 2020 suggestion that the housing assessment include focus on anti-racist and anti-displacement, the City Manager claimed that the City Council, not the City Planner, set housing and anti-displacement policies and ultimately explained that he terminated her because her speech acts exceeded the scope of her authority.

With regard to the housing agenda Appellant put together in early June, Church claimed that Cousins was charged with this task and that, again, Appellant acted *outside* of her authority. Church also took exception to Appellant's inclusion of the words 'anti-racist' on the meeting agenda and the inclusion of City housing goals to members of the Housing Coalition, arguing that this was beyond her role and capacity as City Planner.

Repeatedly, Church sought to curb Appellant's communication with others, particularly after Appellant engaged in external contacts like circulating a draft grant proposal, which noted that the ARC was comprised of only white members. Such speech acts, too, were deemed outside the scope of Appellant's job duties.

Likewise, Appellant had no designated role in the Code Sweep program, which Planning Department staff member Cousins administered. Appellant did attend two meetings about implementation of this program, but when she raised issue with the program design, noting that it targeted blocks on which African Americans lived and might cause displacement, and then took issue with stereotypic comments made by one of her peers to the effect that all denizens of these blocks were junkies or criminals, Appellant was not fulfilling any job-related duties.

Similarly, when she accused her supervisor of having implicit bias, this was not within the scope of her duties.

Rather, though placed in these situations because of her employment [as was Thomas], these statements are more akin to those made by a citizen than an employee.

Following Matthews and Thomas, then, particularly in light of how Appellees' viewed her speech at the time – that is, outside the scope of her official duties, this Court should find that the district court erred in holding that Appellant's speech was not constitutionally protected.

Below, Appellees cited a single case, *Looney v. Black*, 702 F.3D 701, 717 (2d Cir. 2012) for the proposition that Appellant's speech is not protected if it owes its existence to Appellant's job duties and was made in furtherance of those duties. In *Looney*, this Court reviewed grant of a motion to dismiss based on "vague" allegations that supported the conclusion that plaintiff's contested speech about wood burning stoves was plainly within his expansive job duties as Town Building Official.

Here, to the contrary, as the summary judgment record demonstrates, Appellant's speech on Code Sweep did not relate to her job duties. Nor did her raising questions about the bias of the Commissioner of Planning relate to the discharge of the essential nature of her job. And the City Manager concluded that Appellant was operating outside the scope of her duties when she suggested adding the formulation of anti-racist housing policies to the scope of the City's Housing

Assessment. Such suggestions were not, he concluded, within the scope of her duties as the City Planner.

The district court concluded that Appellant repeatedly engaged in speech acts in furtherance of her role as City Planner, but this contravenes the City Manager's own conclusion that Appellant acted outside the scope of her employment. The district court erred at SA-13 when it wrote that Appellant had not established that her supervisor pushed back on the belief that her actions were within the scope of her duties. In fact, both Church and Donat made abundantly clear that they had so concluded and chastised Appellant for speech acts that were allegedly outside of her lane and beyond her authority.

Put another way, in *Garcetti*, the Supreme Court wrote, "[T]he controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy . . . . Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case . . . ." 547 U.S. at 421. "Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do." *Id.*

Here, the same cannot be written of Appellant: by the City's own definition, she was *not* employed to make recommendations on how its housing policy could be more anti-racist or even to recommend that its housing assessment focus on that issue. She was not employed to question whether the Code Sweep program was

impermissibly linking poverty and criminality or to police whether those implementing that program were making racist and stereotypic comments about City residents. She was not employed to publicize the mono-racial nature of the City's Architectural Review Board or to suggest that her own supervisor had implicit racial bias. And, when she made each of these statements, she was acting as a citizen, possessed of information through her employment, which impelled her to engage in speech acts beyond the confines of her job description and duties.

In each of these expressions, Appellant stepped outside of her role as a City Planner, causing the City Manager to view her as operating "outside the scope" of her employment and her own supervisor to try to curb her expressions.

Unlike Ceballos, who was fulfilling his role when he reported office misdeeds, according to Appellees, Appellant's job duties did not contemplate her engaging in the speech acts she did; she was operating out of her lane.

Appellees next submitted that Appellant's speech is not protected because there is no "citizen analogue" to it. In support, Appellees claim that because her statements were made within the confines of the workplace, they cannot be protected. The district court did not reach this issue, but both propositions misstate the controlling law.

In *Weintraub*, the plaintiff alleged that "[D]efendants violated his First Amendment rights by retaliating against him for filing a formal grievance with his

union that challenged the school assistant principal's decision not to discipline a student who had thrown books at him during class." 593 F.3d at 198. The district court dismissed Weintraub's claim in light of *Garcetti*, which held that the First Amendment does not protect speech made pursuant to a public employee's official duties. This Court held that "Weintraub's filing of the grievance was in furtherance of one of his core duties as a public school teacher, maintaining class discipline, and had no relevant analogue to citizen speech" and that he had filed the grievance "pursuant to [his] official duties," and thus, not as a citizen for purposes of the First Amendment. *Id.* This Court further explained that Weintraub's grievance was "pursuant to" his official duties because it was "'part-and-parcel of his concerns' about his ability to 'properly execute his duties,' as a public-school teacher — namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning." *Id.* at 203.

In so holding, the Court re-affirmed the vitality of *Givhan*, where a junior-high English teacher was dismissed primarily because she internally aired her grievances regarding the placement of Black people working in the cafeteria, the integration of the administrative staff, and the placement of Black Neighborhood Youth Corps workers in semi-clerical positions. *See Id.* 203. Ms. Givhan expressed concern with the impression that the "respective roles of whites and blacks" in these positions would leave on Black students.

This Court noted: "From our brief recitation of the facts of *Givhan*, it is plain that, unlike here, the grievance she aired was not in furtherance of the execution of one of her core duties as an English teacher. *Givhan*'s grievance concerned the general impression that Black students might take away from the staffing of non-teaching positions; Weintraub's grievance, in contrast, concerns the administration's refusal to discipline a student who threw books at Weintraub during class." *Id.*

In so holding in *Weintraub*, this Court expressly recognized that, while there is no "civilian analogue" to the filing of a union grievance and thus Weintraub's speech act must have been made as an employee, not as a citizen, the same is not the case where, as here, an employee engages in speech acts which raise racial bias in the employment context to his or her supervisors, as in *Givhan* and here.[1]

Appellant here does not seek constitutional protection for acts that have no civilian analogue as defined in *Weintraub*, and Appellees' contrary claim should be rejected. And even if she did, this Court has reaffirmed that the lack of a civilian

---

[1] "Rather than voicing his grievance through channels available to citizens generally, Weintraub made an internal communication pursuant to an existing dispute-resolution policy established by his employer, the Board of Education. *Cf. Boyce v. Andrew*, 510 F.3d 1333, 1343-44 (11th Cir. 2007) (finding that the "form and context" of the employees' complaints, which were made directly to supervisors and were not "sent to an outside entity," weighed against First Amendment protection). As with the speech at issue in *Garcetti*, Weintraub could only speak in the manner that he did by filing a grievance with his teacher's union as a public employee. *Cf. Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008) (compiling cases "holding that when a public employee raises complaints or concerns up the chain of command about his job duties, that speech is undertaken in the course of performing his job"). His grievance filing, therefore, lacked a relevant analogue to citizen speech and "retain[ed no] possibility" of constitutional protection. *Garcetti*, 547 U.S. at 423, 126 S.Ct. 1951." *Weintraub*, 593 F.3d at 204.

analogue is not dispositive to the inquiry of whether a public employee spoke as a citizen. *See Montero v. City of Yonkers*, 890 F.3d 386, 397-98 (2d Cir. 2018).

Likewise, there is no requirement that Appellant's protected speech be made beyond the confines of her employment context and, again, the contrary argument has been repeatedly rejected, including by this Court in *Matthews*, *supra*. *See also Garcetti*, 547 U.S. at 427 (Souter, J. dissenting) ("We had no difficulty recognizing that the First Amendment applied when Bessie Givhan, an English teacher, raised concerns about the school's racist employment practices to the principal.").

Since the subjects about which Appellant spoke, that is allegations of racial discrimination, are "a matter inherently of public concern" even when made only to a supervisor, appellant engaged in protected activity. *See Connick v. Myers*, 461 U.S. 138, 146, 148, n.8 (1983); *Givhan*, 439 U.S. at 415-16.

Likewise, since the adverse actions closely followed Appellant's repeated protected speech acts, a reasonable jury could find causation. *See Gordon v. NY City Board of Educ.*, 232 F.3d 111,117 (2d Cir. 2000).

Below, Appellees sought a determination on their motivation. On these facts, a reasonable jury could conclude that Appellees lied about their motives and their conduct. Here, Church claims she advocated Appellant's termination in the summer 2020, though Donat recalls no such conversation. Both Appellees admit that, after the summer 2020, Church made no pejorative comments to Donat about Appellant's

employment and that Appellant's conduct and relationships showed "dramatic improvement." Church claims she did not seek Appellant's termination and learned about it one or two days before it occurred.

For his part, Donat gave general reasons for the termination but could recall no specific incidents which supported his adverse action. Though he claimed Appellant was insubordinate, he could not identify any order anyone gave her that she did not follow. While he claims that she worked outside the scope of her employment, other than the single instance a year before when she sought to direct the housing assessment to anti-racist policies, which he claimed was outside her scope, he cited no other instance. While he claimed she did not follow directions or her corrective action plan, he knew of no specific examples of either.

From this testimony, a reasonable jury could reject Appellees' narrative and conclude that they fired Appellant because she repeatedly raised issues they considered "outside the scope of her employment," that is, challenges to the City's alleged commitment to fight racism and displacement on behalf of its minority citizens.

Appellees claimed below that no evidence supported Appellant's narrative. They are wrong. Every time she raised the issue of race, her supervisor responded by shutting her down and trying to limit her communications with third parties and her use of words that recognized the City's need to take concrete steps to undo its

history of racial bias in development, housing, and planning. Plainly, not only did her super-ordinates view these comments as threatening, they explicitly conveyed to Appellant that she acted without the bounds of her job duties by mentioning such matters.

Appellees otherwise rely on disputed inferences in supporting Appellant's termination. What is most clear is that, after Appellant responded "yes" to her supervisor's question as to whether Godfryd felt that she was a racist, Church gave her a counseling memo, issued seven directives, and scheduled a follow- up meeting, allegedly to check on Appellant's progress. However, after September 3, 2020, Appellant heard nothing further from Church about the seven directives and the Planning Department Director never conducted the follow-up meeting. This suggests the performance-related issues Appellees cite are pretextual and carry little force in explaining Appellant's termination.

Likewise, Donat knew nothing about any interaction between Appellant and Zeldin, and Appellee's effort to use that as some neutral non-discriminatory basis for adverse action falls flat. Even had he known about the incident, it demonstrates nothing more than that Appellant was assigned to attend a Zoom meeting, did so, was given an opportunity to find out more about a specific strategy which could curb displacement, took advantage of that learning opportunity, clarified with Zeldin that

she was not representing the City's interest in seeking information about that strategy, and then reported this to her superior, Church.

This sequence of events did not cause Church to advocate for any disciplinary action against Appellant or to claim that Appellant violated any of the September 3, 2020 directives.

Appellees' contrary narrative is fictional and dispelled by Church's deposition testimony – the Zeldin matter was plainly no big deal. Desperate to try to predicate the adverse action on something other than their retaliatory response to her speech acts focused on racial bias, Appellees have fastened on the innocuous Zeldin incident and Appellant's alleged pattern of lateness or absences. Of course, in justifying his action, Donat made no mention of the latter and it serves Appellees no use whatsoever.

A reasonable jury could determine that Appellees terminated Appellant because she engaged in speech acts protected by the First Amendment, and so the district court should have denied Appellees' motion for summary judgment dismissal of this claim.

The district court's conclusion that Appellant's engaged in her speech acts as part of her employment because she couched her statements in inclusionary language, suggesting her intent to make the Department and City more determined to rectify the effects of racial discrimination, does not change anything. Certainly,

her language did not lead the City Manager to believe that her advocacy was engaged in as part of her duties and responsibilities.

## Point II

### A reasonable jury could find that Appellees violated Appellant's right to Equal Protection.

Appellant alleges that Appellees intentionally terminated her for a second, related reason: because she opposed discriminatory language and behavior, advocated for minority communities, and positively associated with minority leaders (JA-19 ¶ 65). The district court rejected this, mischaracterizing her claim as one relating to "due process" (SA-14). But her claim arises from the principle that government entities may not engage in adverse action in retaliation for activity that challenges or opposes discrimination.

Appellees submitted below that the Equal Protection clause does not apply in the public context to claims by a Caucasian employee that she was treated differently than other similarly situated employees. Of course, Appellant has not asserted a disparate treatment claim. Rather, she asserts that she was retaliated against for opposing discrimination against minorities and was terminated on that ground in violation of her right to equal protection.

In *Vega v. Hempstead U.F.S.D.*, 801 F.3d 72, 91 (2d Cir. 2015), this Court unequivocally recognized that the Fourteenth Amendment protects people, like Appellant, from retaliation for their complaints of race discrimination. "As a

28

threshold matter, we note that the district court erred in concluding that, for a retaliation claim, an Appellant needs to demonstrate a connection between the alleged retaliatory acts and his ethnicity . . . . *Retaliation occurs when an employer takes action against an employee not because of his ethnicity, but because he engaged in protected activity—complaining about or otherwise opposing discrimination*." *Id.* at 91 (emphasis added).

Below, Appellees failed even to cite this this controlling precedent, and this court should reject the conclusion that, because she is Caucasian, Appellant may be terminated because she complained of discrimination without violating the Equal Protection clause. She cannot be.

Likewise, the district court failed to cite *Vega* or explain why it does not protect Appellant against retaliation for her opposition to racial discrimination as manifest by the linking of low income/minority status to criminality and the exclusion of minorities from a critical municipal board that reviews major re-development projects for a dominantly minority-populated city.

Appellant established a *prima facie* case of unlawful retaliation. She complained about racial discrimination by her employer in several ways – through the City's failure to promote housing and anti-displacement policies, which addressed its long history of housing discrimination; through the City's administration of the Code Sweep program, by which it proposed to selectively focus

enhanced enforcement efforts on certain sub-neighborhoods where African Americans lived and by the stereotypic depiction of the residents of those areas by the City employee responsible for implementing this program; through the racially exclusive nature of its critical Architectural Review Commission.

Appellant's supervisors understood her speech about these matters as being critical of the racial status quo and as an unequivocal call for greater urgency in addressing these issues. Undoubtedly, the City's decision maker knew of Appellant's advocacy and complaint. Appellant was undeniably terminated, and a reasonable jury could find a causal relationship between Appellant's continued advocacy/complaints and the adverse action.

Appellees next submitted that, since she complained as an employee, her complaints were not protected by the First Amendment. But, even if that were true, it would make no difference to her equal protection claim. *Vega* asserted no First Amendment protection for his complaints of discrimination, and yet the Fourteenth Amendment anti-retaliation principle fully protected him. See *Vega*, at 81-82, 92.

Appellees next argued below that they had non-discriminatory bases for terminating Appellant. But, as discussed above, at best, these fact-based assertions are arguable, and a reasonable jury could reject each and every one of them and find them pretextual and that Appellant's advocacy was a but for cause of the adverse employment action. *See Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019).

**Ponit III**

**Appellant's *Monell* claim is viable.**

In *Agosto v. NY City Dept of Education*, this Court noted:

> The Supreme Court has said that a municipality may be liable for the acts of a single official—but only if that official is someone "whose edicts or acts may fairly be said to represent official policy" for the entire municipality. *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. It is not enough that an official had discretion to make a decision that was unreviewable. *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003). Rather, the official must have been sufficiently "high up in the municipal hierarchy," *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992), that he was "responsible under state law for making policy in that area of the municipality's business," *Jeffes*, 208 F.3d at 57 (emphasis and alteration omitted). The authority to make policy "necessarily" means "the authority to make final policy." *Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915. Stated another way, the official must have had state-law "authority to adopt rules for the conduct of [the municipal] government." *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992).
>
> "Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law," *Jeffes*, 208 F.3d at 57 (internal citations omitted), and therefore must be resolved "before the case is submitted to the jury," *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (emphasis omitted).

982 F.3d 86, 98 (2d Cir. 2020).

Appellee City claimed below that the City Manager is not a final policy maker in the area of employment practices. But this is incorrect. The City Charter contains

31

the following provision among the duties of the City Manager: "To appoint and to remove the heads of all departments, the members of all boards and commissions and all subordinate officers and employees of the City, except as otherwise provided herein." City of Newburgh Charter, § C5.05(B), *available online at* https://ecode360.com/15609591#15609591 (last visited Aug. 9, 2024).

The City Council plays no role in employment matters in Newburgh, and the City Manager sets policies with regard to municipal employment. Accordingly, the acts of the City Manager are the acts of the City in this regard, and municipal liability will follow any determination that Donat violated either of the asserted rights.

To equate the authority of the City Manager in Newburgh with that of a single high school principal in New York City is baseless, and *Agosto* does not dictate the contrary result here.

## Point IV

### Qualified immunity does not shield the individual Appellees.

Neither individual Appellee is entitled to qualified immunity. If a jury determines that Donat fired Appellant upon the recommendation of Church and that both were motivated by a desire to suppress Appellant's speech acts about matters of public importance and/or to punish Appellant for her complaints about discrimination, both violated the First and Fourteenth Amendments as clearly established by the Supreme Court of the United States in *Givhan v. Western Line*

*Consolidated School District*, 439 U.S. 410 (1979) and by this Court in *Vega v. Hempstead Unified School Distric*t, 801 F.3d 401 (2d Cir. 2015).

*McCullough v. Wyandanch*, 187 F.3d 272 (2d Cir. 1999) is not to the contrary. Here, unlike there, no argument can reasonably be made that Appellant was disruptive to the workplace or that the *Pickering* balance shifts radically in favor of the employer.

Rather, here, Appellant's own supervisor swore that Godfryd had "remarkably improved" in inter-personal relations and communication after September 3, 2020, the terminating official allegedly received no recommendation to terminate from Appellant's supervisor, and the appointing/firing official claimed that Appellant was insubordinate, though he could not identify how, and that she was operating outside the scope of her employment, a plain reference to her anti-racist messaging and complaints.

Appellees violated Appellant's clearly established rights and, on this record, qualified immunity cannot apply as a matter of law.

## CONCLUSION

For the reasons set forth above, the grant of Appellees' motion for summary

judgment should be reversed and vacated and the matter remanded for trial

Dated:      Goshen, New York
              August 9, 2024           Respectfully submitted,

                                      SUSSMAN & GOLDMAN
                                      *Attorneys for Plaintiff-Appellant*

                              By:   */s/ Michael H. Sussman*
                                      Michael H. Sussman, Esq.
                                      1 Railroad Avenue, Ste. 3
                                      P.O. Box 1005
                                      Goshen, New York 10924
                                      (845) 294-3991 [Tel.]
                                      (845) 294-1623 [Fax]
                                      sussman1@sussman.law

## CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,830 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in Time New Roman 14-point type for text and footnotes.

# SPECIAL APPENDIX

# SPECIAL APPENDIX
# TABLE OF CONTENTS

District Court Opinion & Order, entered April 10, 2024 .................................. SA-1

Judgment, entered April 10, 2024 ....................................................................... SA-16

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 43 of 58

Case 7:21-cv-04009-NSR-VR    Document 45    Filed 04/19/24    Page 2 of 17
Case 7:21-cv-04009-NSR-VR    Document 44    Filed 04/10/24    Page 1 of 1

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ELKA GOTFRYD,

                Plaintiff,

       -against-

CITY OF NEWBURGH, ALEXANDRA CHURCH,
and JOSEPH DONAT,.

                Defendants.

-------------------------------------------------------------------X

21 **CIVIL** 4009 (NSR)

# **JUDGMENT**

      It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons
stated in the Court's Opinion & Order dated April 10, 2024, Defendants' motion for summary
judgment is granted. Plaintiff's causes of action are dismissed in their entirety. Judgment entered
in favor of Defendants, and the case is closed.

**Dated:** New York, New York
        April 10, 2024

                             **RUBY J. KRAJICK**
                              **Clerk of Court**

         **BY:**

                              **Deputy Clerk**

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 44 of 58

Case 7:21-cv-04009-NSR-VR    Document 45    Filed 04/19/24    Page 3 of 17
Case 7:21-cv-04009-NSR-VR    Document 43    Filed 04/10/24    Page 1 of 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELKA GOTFRYD,

　　　　　　　　　　　　Plaintiff,

　　　-against-

CITY OF NEWBURGH, ALEXANDRA
CHURCH, and JOSEPH DONAT,

　　　　　　　　　　　　Defendants.

---

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 04/10/2024

21 Civ. 4009 (NSR)

OPINION & ORDER

**NELSON S. ROMÁN, United States District Judge:**

Plaintiff Elka Gotfryd commenced this action via complaint filed against Defendants City of Newburgh (the "City"), Alexandra Church, and Joseph Donat pursuant to 42 U.S.C. § 1983. ("Compl." ECF No. 6.) Plaintiff alleges Defendants violated her rights under the First and Fourteenth Amendments of the Constitution after they terminated her in retaliation of her advocacy for anti-racist policies.

Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 seeking to dismiss Plaintiff's claims in their entirety. For the following reasons, the Court grants Defendants' motion.

## BACKGROUND

The following facts are derived from the record, the parties' Rule 56.1 statements, and the parties' declarations and affidavits.[1] They are not in dispute unless otherwise noted.

---

[1] On March 6, 2023, the parties fully briefed the instant motion: Defendants' Motion for Summary Judgment (ECF No. 34); Defendants' Rule 56.1 Statement ("Def. 56.1," ECF No. 35); Defendants' Memorandum of Law in Support ("Def. Mem.," ECF No. 37); Defendants' Reply ("Def. Reply," ECF No. 38); Declaration of Lauren Schnitzer in Support of Defendants' Motion (ECF No. 36); Reply Affirmation of Lauren Schnitzer in Support of Defendants' Motion (ECF No. 39); Plaintiff's Memorandum of Law in Opposition ("Pl. Opp." ECF No. 41); and Plaintiff's Rule 56.1 Response and Counterstatement ("Pl. 56.1 Resp." or "Pl. 56.1 Counter," ECF No. 40). Attached to Plaintiff's Opposition is her affidavit, cited to as "Gotfryd Aff."

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 45 of 58

Case 7:21-cv-04009-NSR-VR   Document 45   Filed 04/19/24   Page 4 of 17
Case 7:21-cv-04009-NSR-VR   Document 43   Filed 04/10/24   Page 2 of 15

### A. Plaintiff's Role as City Planner for the City

Plaintiff served in the Civil Service position of City Planner for the City of Newburgh (the "City") from February 2020 through March 9, 2021. (Def. 56.1 ¶¶ 1,8.) During her tenure, Defendant Joseph Donat served as City Manager and Defendant Alexandra Church served as the City's Director of Planning and Development. (*Id.* ¶¶ 2-3.) From March 5, 2020 until at least May 2020, Church took maternity leave of absence. (*Id.* ¶ 4.) Prior to and following her leave of absence, Church served as Plaintiff's direct supervisor and reported to Donat. (*Id.* ¶¶ 5, 7.)

In addition to her general job duties, Plaintiff's job functions for City Planner included providing information to the City's Planning Board (the "Board") on specific projects coming before the Board; preparing pre-application letters, called "informationals," in response to proposal applications submitted to the City; and handling long-term planning assignments, which included review of long-term planning projects. (*Id.* ¶¶ 14-16.) One of the main roles of City Planner included being able to hear multiple sides of an issue and to provide a voice to minority groups and unrepresented groups in a way that allows those individuals to be heard. (*Id.* ¶ 12.) However, Plaintiff contests that Church had either an interest in playing this role or in permitting Plaintiff to do so. (Pl. 56.1 Resp. ¶ 12.)

As City Planner, Plaintiff worked under the general supervision of the Director of the City's Department of Planning and Development (the "Department"). (Def. 56.1 ¶ 17.) The Department's functions include community development, "long-term planning," land use review, economic development, and management of a series of grants and policies. (*Id.* ¶ 18.) The Department

---

Citations to "Def. Ex." refer to the Exhibits attached to the Schnitzer's Declaration and Reply Affirmation. Where applicable, the Court refers to page numbers using the Bates numbers applied by the parties. Citations to the Transcript of Joseph Donat ("Donat Tr.") refer to Def. Ex. D.

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 46 of 58

Case 7:21-cv-04009-NSR-VR    Document 45    Filed 04/19/24    Page 5 of 17
Case 7:21-cv-04009-NSR-VR    Document 43    Filed 04/10/24    Page 3 of 15

evaluated changes to housing, changes to population, changes to parks, and changes to transportation. (*Id.* ¶ 19.)

### B. Plaintiff's Speech at Issue in the Action

#### a. *Plaintiff's Draft Scope of Work for the Housing Needs Assessment*

When Plaintiff first started as City Planner, the City was in the early stages of a housing needs assessment, which assesses the gaps in housing provisions in a particular geographic area. (Def. 56.1 ¶¶ 32-33.) For this project, the City hired the consultant Kevin Dwarka to study the existing conditions of various housing challenges within the City and to propose recommendations to address those challenges. (*Id.*) Plaintiff was tasked with reviewing and revising Dwarka's scope of work to ensure it met municipal needs. (*Id.* ¶ 34; Pl. 56.1 Resp. ¶ 34.) Church would then review the document and approve the final version before the project could commence. (Def. 56.1 ¶ 35.) Plaintiff reviewed Dwarka's draft scope of work and made several handwritten changes to and comments on that document. (*Id.* ¶ 36.)

Most relevant here, Plaintiff included new goals for the proposed project, two of which provided that the project would "[i]dentify antiracist, anti-displacement strategies for fair and accessible housing and economic development" and "[i]dentify mechanisms in place that perpetuate displacement and racism, barriers in making significant changes to these mechanisms, and leverage points to undo harm." (*Id.* ¶¶ 39-40.) Church reviewed, revised, and commented on Plaintiff's draft and, most relevant here, removed the words "antiracist" and "racism" from Plaintiff's proposed goals. (*Id.* ¶ 43; Pl. 56.1 Resp. ¶ 43.) Later, Plaintiff asked Church about the removal of the term "anti-racist," and Church explained she was concerned the term would alienate Hispanic homeowners. (Def. 56.1 ¶ 47; Pl. 56.1 Resp. ¶ 48; Gotfryd Aff. ¶ 6.)

3

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 47 of 58

Case 7:21-cv-04009-NSR-VR   Document 45   Filed 04/19/24   Page 6 of 17
Case 7:21-cv-04009-NSR-VR   Document 43   Filed 04/10/24   Page 4 of 15

b.   *Plaintiff's June 8, 2020 Email to Newburgh Housing Coalition*

The Newburgh Housing Coalition (the "Coalition") is an informal committee consisting of individuals representing various organizations that focus on the City's housing issues. (Def. 56.1 ¶ 50.) In her capacity as City Planner, Plaintiff attended and helped coordinate the Coalition's meetings, including preparing meeting agendas. (*Id.* ¶¶ 51-52.) On June 8, 2020, prior to Church's review or approval, Plaintiff sent an email to the members of the Coalition and enclosed an agenda for a Zoom meeting scheduled later that day. (*Id.* ¶¶ 55, 56; Gotfryd Aff. ¶ 8.) Plaintiff included in the email a "draft list of working goals" that Plaintiff stated she intended to use as her "guide over the course of the next year of [her] tenure as City Planner." (*Id.* ¶ 57.) The third goal provided that Plaintiff would: "[i]dentify anti-racist and antidisplacement strategies for fair, accessible and safe housing and economic development." (*Id.* ¶ 58.) Church later directed Plaintiff to provide all memoranda she intended to circulate publicly to Church ahead of time. (*Id.* ¶ 60.)

On July 13, 2020, Plaintiff emailed Church regarding her use of the term "anti-racist" in external-facing work for the City. (*Id.* ¶ 62.) Plaintiff and Church again discussed Church's concerns that the term "anti-racist" could alienate some community members. (*Id.* ¶¶ 63-65; Gotfryd Aff. ¶ 9.) In the email, Church also stated the email was a "gross oversimplication of complicated topics." (Def. 56.1 ¶ 64 (citing Def. Ex. H at 492).)

c.   *Plaintiff's Comments Regarding the City's Code Sweeps Program Meeting*

Plaintiff and Church attended at least one if not two meetings regarding the City's Code Sweeps program. (Def. 56.1 ¶ 68; Pl. 56.1 Resp. ¶ 68.) The Code Sweeps program was developed to improve housing conditions in City neighborhoods by locating and reducing City Code violations within certain geographic areas of the City. (Def. 56.1 ¶ 69.) In or around early August 2020, Plaintiff participated in a Code Sweeps meeting in her capacity as City Planner. (*Id.* ¶ 71.)

4

In early August 2020, Plaintiff emailed Church and another colleague summarizing her thoughts regarding the meeting, including her disagreement with the use of certain language to describe individuals living in poor housing conditions or with substance abuse disorders. (Def. 56.1 ¶ 72; *see* Def. Ex. M.) For example, Plaintiff raised concerns that (1) an individual had generalized people living in poor housing conditions as "all drug dealers or violent criminals"; (2) that city policies might facilitate the displacement of lower income minorities; and (3) during the meeting, the term "junkie" was used several times to refer to individuals struggling with substance abuse disorders. (Def. Ex. M at 249, 251.)

In response, Church advised that she and others would "work better" to use language that was not hurtful, pejorative, or accusatory, and explained that the City and its partners work to ensure services are provided to all residents, unsheltered or otherwise. (*Id.* at 249.) In response, Plaintiff offered to "help with outreach, with partnerships, [and] with making this program reflect the other good work we are doing." (*Id.*) Erin Cousins, the City's Neighborhood Stabilization Coordinator and chair of the Coalition committee while Church was on leave, also responded to the email. (Def. 56.1 ¶ 53.) She stated that Plaintiff had "misunderstood [her] so many times" that she no longer felt comfortable communicating with Plaintiff. (Def. Ex. M at 248.)

d.  *Plaintiff's Grant Application*

In or around November 2020, Plaintiff sought an African American Civil Rights History Grant for the City that was directed at exploring and exposing the history of African American civil rights advocacy in the city. (Def. 56.1 ¶ 92.) Despite her job description including administration and management of state and federal grants, Plaintiff did not fulfill that role. (Def. 56.1 ¶ 70; Gotfryd Aff. ¶ 10.) However, Plaintiff admits that her submission of the grant application was made within her capacity as City Planner. (*Id.* ¶ 94; Pl. 56.1 Resp. ¶ 94.) On or about December

5

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 49 of 58

Case 7:21-cv-04009-NSR-VR    Document 45    Filed 04/19/24    Page 8 of 17
Case 7:21-cv-04009-NSR-VR    Document 43    Filed 04/10/24    Page 6 of 15

22, 2020, Plaintiff submitted a letter to Donat and Michelle Kelson, the City's Corporation Counsel, regarding the grant application in which she complained that Church had told her to remove a phrase that described the Architectural Review Commission ("ARC") as "all-white." (Def. 56.1 ¶¶ 95-96, 85.) In her capacity as Plaintiff's supervisor, Church had instructed Plaintiff that she could not include in the City's grant application a description of the racial composition of the ARC. (*Id.* ¶ 97.)

### C. Plaintiff is Terminated

On March 9, 2021, Donat terminated Plaintiff. (Compl. ¶ 56.) The parties dispute the reasons for Plaintiff's termination.

### LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, including depositions, documents, affidavits, or declarations "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). To oppose summary judgment, "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding the

6

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 50 of 58

Case 7:21-cv-04009-NSR-VR    Document 45    Filed 04/19/24    Page 9 of 17
Case 7:21-cv-04009-NSR-VR   Document 43   Filed 04/10/24   Page 7 of 15

nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (holding the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation") (internal quotations and citations omitted).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013). Courts must "draw all rational inferences in the non-movant's favor" when reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248). Importantly, "the judge's function is not [ ] to weigh the evidence and determine the truth of the matter" or determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250. A court should grant summary judgment when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## DISCUSSION

Plaintiff's Complaint allege two causes of action: (1) violation of Plaintiff's right to equal protection of the law under the Fourteenth Amendment by terminating Plaintiff "because she opposed discriminatory language and behavior, advocated for minority communities, and positively associated with minority leaders"; and (2) violation of Plaintiff's First Amendment rights by terminating Plaintiff "because she opposed discriminatory practices, something her supervisors deemed to be beyond her job functions and responsibilities." (Compl. ¶¶ 65-66.) Defendants argue they are entitled to summary judgment on both claims.

7

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 51 of 58

Case 7:21-cv-04009-NSR-VR    Document 45    Filed 04/19/24    Page 10 of 17
Case 7:21-cv-04009-NSR-VR    Document 43    Filed 04/10/24    Page 8 of 15

### I.    First Amendment Retaliation Claim

Plaintiff alleges Defendants retaliated against her by terminating her because she advocated for the City to adopt anti-racist policies. "A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) [her] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against [her]; and (3) there was a causal connection between this adverse action and the protected speech.'" *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir.2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir.2011)). Defendants argue Plaintiff's First Amendment retaliation claim should be dismissed because Plaintiff's speech was made pursuant to her official duties rather than in her capacity as a private citizen. (Def. Mem. at 4.) Plaintiff counters that Donat and her supervisors deemed Plaintiff's speech beyond the scope of her employment, and that she was acting as a citizen and not an employee in challenging the City's racist policies. (Pl. Opp. at 11-12.)

A public employee alleging First Amendment retaliation must allege that the speech concerned "matters of public concern rather than . . . personal interest . . . ." *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir.2003) (internal quotation and citation omitted). "Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or other concern to the community.'" *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)); *Garcia v. State Univ. of N.Y. Health Sci. Ctr.*, 280 F.3d 98, 105 (2d Cir. 2001)). Importantly, "when public employees make statements pursuant to their *official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) (emphasis added).

8

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 52 of 58

Case 7:21-cv-04009-NSR-VR    Document 45    Filed 04/19/24    Page 11 of 17
Case 7:21-cv-04009-NSR-VR    Document 43    Filed 04/10/24    Page 9 of 15

The Second Circuit has noted that whether an employee makes a statement pursuant to their official duties is an "objective" test. *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 202 (2d Cir. 2010). "The inquiry into whether a public employee is speaking pursuant to her official job duties is not susceptible to a brightline rule. Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir.2012). Speech is made pursuant to a plaintiff's official duties "when the speech at issue owes its existence to those job duties, or when the speech is part-and-parcel of the employee's concerns about her ability to properly execute her duties." *Bloomberg v. New York City Dep't of Educ.*, 410 F. Supp. 3d 608, 620 (S.D.N.Y. 2019) (citing *Weintraub*, 593 F.3d at 202 and *Garcetti*, 547 U.S. at 421-22, 423)) (cleaned up). "[T]he key question in determining whether Plaintiff spoke as an employee or as a citizen is whether her speech was undertaken in the course of performing her primary employment responsibility and was aired in furtherance of execution of one of her core duties as principal." *Id.* 620 (citation omitted).

Though this inquiry "may be somewhat fact-intensive, it presents a question of law for the court to resolve." *Ganim*, 342 F.3d at 112 (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999) (citing *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. 1684)).

The parties do not dispute the allegedly constitutionally protected speech at issue. Plaintiff alleges she engaged in protected speech when (1) in February 2020, she included the terms "racist" and "antiracist" within a draft scope of work for a proposed housing needs assessment; (2) in June 2020, she sent an email to members of the Coalition with her "draft working goals" that again included the term "anti-racist"; (3) in August 2020, she sent emails to Cousins and Church after attending a meeting regarding the implementation of the City's Code Sweeps program, which

9

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 53 of 58

Case 7:21-cv-04009-NSR-VR    Document 45    Filed 04/19/24    Page 12 of 17
Case 7:21-cv-04009-NSR-VR    Document 43    Filed 04/10/24    Page 10 of 15

raised concerns about the implementation of the program and stereotypical comments made about individuals in the neighborhood; and (4) in November 2020, she noted that the City's ARC was comprised of "all white" members in her grant application on behalf of the City. (Def. Mem. at 5-9; Pl. Opp. at 13-14.) Plaintiff has failed to raise a genuine issue of material fact. Plaintiff's own statements in her emails and her affidavit belie her assertion that she acted as a citizen and not an employee. The Court thus finds her speech occurred while she was acting within the scope of her official duties and warrant no First Amendment protection.

*First*, Plaintiff was tasked with reviewing the consultant's draft scope of work to ensure the proposed housing needs assessment met the needs of the municipality. (Def. 56.1 ¶ 43; Gotfryd Tr. 39:8-40:8.) Plaintiff does not dispute that she had been assigned this task as part of her job. (Def. 56.1 ¶ 36; Gotfryd Tr. 39:21-22 (stating she would be the "City liaison" for the consultant).) The consultant had been hired on behalf of the City, the scope of work was for a project to assess the housing needs of the City, and Plaintiff's supervisor was to review and approve the draft.

*Second*, Plaintiff prepared a meeting agenda for the Coalition's meeting that "included a draft list of working goals" that Plaintiff stated she intended to use as her "guide over the course of the next year of *[her] tenure as City Planner*." (Def. Ex. J at 643 (emphasis added).) By the plain text of the draft, Plaintiff again explicitly ties her speech to her role and job duties as City Planner. Later, Plaintiff even asks Church for clarification on her use of the term "anti-racist" with respect to "[the Department's] external-facing work" in an effort to avoid "*misrepresentation of the [D]epartment*." (Def. Ex. J at 492 (emphasis added).)

*Third*, Plaintiff admits she participated in the City Sweeps Program as the City Planner. (Def. 56.1 ¶ 71.) Moreover, the follow-up email occurs in the context of Plaintiff emailing her supervisor and colleague that she had been "pondering heavily about *our* approach to Code

10

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 54 of 58

Case 7:21-cv-04009-NSR-VR    Document 45    Filed 04/19/24    Page 13 of 17
Case 7:21-cv-04009-NSR-VR    Document 43    Filed 04/10/24    Page 11 of 15

Sweeps." (Def. Ex. M at 250 (emphasis added).) The word "our" here undoubtedly refers to the Department. For the remainder of the email, Plaintiff continues to place her thoughts in the context of her role in the Department. Plaintiff states "[she] appreciate[s] the work [the Department] is doing" but she has concerns that "some blind spots [] are leading [the Department] to engage in planning tactics that are essentially racist." (*Id.* at 251.) Plaintiff even ends the email by stating that she "will no longer have a doubt that our [D]epartment is interested in actively displacing marginalized communities, and complicit in gentrification of the City of Newburgh." (*Id.* at 250.) The emails that follow make clear that Plaintiff intended her statements to lead to "further dialogue" and additional "responsibility and initiative *as a member of the departmental team*." (*Id.* at 249 (emphasis added).) In her affidavit, Plaintiff even states she was "try[ing] to get [the Department] to realize [it] needed to adopt programmatic priorities which matched the city's need to overcome the impact of racist housing and re-development policies and properly serve a city so dominantly populated by people of color." (Gotfryd Aff. ¶11.)

*Finally*, Plaintiff admits that the submission of the grant application was made within her capacity as City Planner. (Def. 56.1 ¶ 94.) Moreover, Plaintiff herself even states that she was working on the grant application "[o]n behalf of the Department of Planning and Development." (Def. Ex. T at 253.) In her letter to Donat and Kelson, Plaintiff further ties her use of this language to her duties by stating in the letter that "Church is obstructing [her] ability to perform [her] *work duties as a civil servant* with integrity" by instructing Plaintiff to remove the "key fact" that the ARC was comprised of "all white" members. (*Id.* at 253 (emphasis added).)

Plaintiff's linking of her speech and actions to her efforts to bring anti-racist and anti-discrimination policies and practices to the Department as part of her role as City Planner is also explicitly stated throughout Plaintiff's Complaint. Plaintiff states that "within weeks" of starting

11

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 55 of 58

Case 7:21-cv-04009-NSR-VR    Document 45    Filed 04/19/24    Page 14 of 17
Case 7:21-cv-04009-NSR-VR    Document 43    Filed 04/10/24    Page 12 of 15

her employment, "she developed a goal that the City's planning efforts . . . should be 'anti-racist' in nature and should strive to be beneficial to residents of color in the City and to combat systemic racism." (Compl. ¶ 9.) Plaintiff further asserts she shared with the Coalition an agenda of target goals that included "the aim to 'identify anti-racist and anti-displacement strategies for fair, accessible, and safe housing and economic development." (*Id.* ¶¶ 14-16.) Plaintiff even alleges she "offered to work on more meaningful outreach, partnerships, and programs to combat issues of systemic racism in the City in a more meaningful way." (*Id.* ¶ 31.)

The undisputed evidence in the record overwhelmingly proves that Plaintiff's speech was made pursuant to her job as City Planner. Plaintiff reviewed and revised the draft scope of work and the meeting agenda as part of her job duties. She attended the City Sweeps meeting as a representative of the City and the Department, and the communications that followed were submitted to her supervisor with the goal of making concrete changes in the Department. Finally, Plaintiff submitted the grant application on behalf of the Department. It is clear here that Plaintiff's speech was "part-and-parcel" of her concerns with not only her ability to perform her job duties, but also with the Department's ability to perform its function in the City. *See Bloomberg*, 410 F. Supp. 3d at 620-21 (plaintiff-principal was speaking as an employee when she made a plea for resources and fairness as to the availability of extracurricular sports teams for her students).

The crux of Plaintiff's opposing argument is that Defendants deemed her advocacy and practices of anti-discrimination as "beyond the scope of her duties." (Gotfryd Aff. ¶ 3.) Specifically, Plaintiff claims that Defendants sought to curb her anti-racist advocacy, and "strongly suggested" she acted outside the scope of her duties whenever she raised concerns with the City's policies. (Pl. Opp. at 12.) However, the only evidence in the record showing that Defendants considered Plaintiff's use of the term "anti-racist" as beyond the scope of her duties is Donat's

12

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 56 of 58

Case 7:21-cv-04009-NSR-VR    Document 45    Filed 04/19/24    Page 15 of 17
Case 7:21-cv-04009-NSR-VR    Document 43    Filed 04/10/24    Page 13 of 15

testimony that "the city counsel was developing its own policy related to [anti-racism]" and therefore Plaintiff did not need to address it. (Donat Tr. 51:11-13; Def. 56.1 ¶ 49.) Plaintiff denies that this was even communicated to her and does not dispute that Church advised her against the use of the term "anti-racist" because of her concerns of alienating the Hispanic community. (Pl. Aff. ¶¶ 6-7, 9.) Regarding Plaintiff's emails relating to the Code Sweeps meeting, Cousins told Plaintiff she felt uncomfortable communicating with her because Plaintiff "misunderstood" her so many times. (Def. Ex. M at 248.) Beyond her conclusory assertions, Plaintiff fails to present any evidence in the record to support her contention that Church or any other member of the Department expressed or implied that her actions were beyond the scope of her job as City Planner.

In fact, the record clearly establishes that Plaintiff herself believed her actions to be within the scope of her duties. This is true even if, and Plaintiff has not established this to be the case, her supervisor pushed back on this belief. Plaintiff's undisputed belief and persistence in the need for herself as City Planner and the Department to promote and institute anti-racist and anti-discrimination policies and practices is sufficient to prove she engaged in such speech pursuant to her official duties. *Weintraub*, 593 F.3d at 202 (finding plaintiff's grievance was "pursuant to his official duties because it was part and parcel of his concerns about his ability to properly execute his duties") (citation omitted); *see also Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 116 (2d Cir. 2011) ("When a government employee concededly engages in speech pursuant to his official duties, the fact that he persists in such speech after a supervisor has told him to stop does not, without more, transform his speech into protected speech made as a private citizen.").

Accordingly, Plaintiff's speech does not fall within the protections of the First Amendment. Defendants are entitled to summary judgment on this claim.

13

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 57 of 58

Case 7:21-cv-04009-NSR-VR   Document 45   Filed 04/19/24   Page 16 of 17
Case 7:21-cv-04009-NSR-VR   Document 43   Filed 04/10/24   Page 14 of 15

## II.   Fourteenth Amendment Retaliation Claim

Plaintiff argues Defendants seek to dismiss Plaintiff's Fourteenth Amendment Retaliation claim on the grounds that she fails to allege discrimination based on differential treatment[2] and that she never submitted a complaint that she faced discrimination. (Def. Reply at 8-9.) Plaintiff responds that she is alleging Defendants terminated her for "complaining about racial discrimination by her employer," specifically "through the City's failure to promote housing and anti-displacement policies[;] . . . administration of the Code Sweep program[;] . . . and by the stereotypic depiction of the residents of [certain sub-neighborhoods]." (Pl. Opp. at 22.)

Courts in the Second Circuit have routinely dismissed Fourteenth Amendment due process claims that are duplicative and/or derivative of claims for retaliation for First Amendment activity. *See Fierro v. City of New York*, No. 1:20-CV-09966-GHW, 2022 WL 428264, at *6 (S.D.N.Y. Feb. 10, 2022) ("[C]ourts in this Circuit routinely hold that equal protection claims premised on the same allegations as a First Amendment claim cannot proceed where the First Amendment claim has been dismissed."); *Loc. 3599, NYC Dep't of Env't Prot. Tech. Pro. Emps. v. City of New York*, No. 23-CV-1035 (JGLC), 2024 WL 966077, at *12 (S.D.N.Y. Mar. 6, 2024) (dismissing plaintiff's equal protection claim as duplicative of their First Amendment retaliation claim); *Whitehead v. City of New York*, 953 F. Supp. 2d 367, 377 (E.D.N.Y. 2012) (same); *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 518 (E.D.N.Y. 2011) (same).

As made clear in her Opposition and her Complaint, Plaintiff's Fourteenth Amendment claim arises from the same factual allegations as her First Amendment claim. (*See* Compl. ¶¶ 65-

---

[2] An individual public employee may not bring a Fourteenth Amendment retaliation claim based on discrimination due to differential treatment not based on membership in a particular class—commonly referred to as a class-of-one claim. *Appel v. Spiridon*, 531 F.3d 138, 140–41 (2d Cir. 2008) (citing *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 594, 605–08, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008)).

14

Case: 24-1039, 08/09/2024, DktEntry: 22.1, Page 58 of 58

Case 7:21-cv-04009-NSR-VR    Document 45    Filed 04/19/24    Page 17 of 17
Case 7:21-cv-04009-NSR-VR    Document 43    Filed 04/10/24    Page 15 of 15

66; Pl. Opp. at 22-24.) Accordingly, the Court dismisses Plaintiff's Fourteenth Amendment retaliation claim as derivative and duplicative of her First Amendment retaliation claim.

### III.  *Monell* Claim

A municipality may be held liable under Section 1983 if "the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality. *Jones v. Town of East Haven*, 691 F.3d 72 (2d Cir. 2012); *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 698 (1978). "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (citing *Monell*, 436 U.S. at 694) (emphasis in original). To the extent a plaintiff fails to allege an underlying constitutional violation, his *Monell* claims must also fail. *Grytsyk v. Morales*, 527 F. Supp. 3d 639, 568 (S.D.N.Y. 2021).

As the Court has dismissed Plaintiff's claims arising under the First and Fourteenth Amendment, "her *Monell* claims must likewise be dismissed." *Collymore v. City of New York*, 767 Fed. Appx. 42, 47 (2d Cir. 2019) (quoting *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013)).

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted. Plaintiff's causes of action are dismissed in their entirety. The Clerk of the Court is directed to terminate the motion at ECF No. 34, to enter judgment in favor of Defendants, and to terminate the action.  SO ORDERED.

Dated: April 10, 2024
        White Plains, New York

                                            _____
                                            Nelson S. Román, U.S.D.J.

15